Good morning, Your Honors. Thomas Orlando for Appellant Green Plains. May it please the Court. We believe our claims for design defect and failure to warn should be tried to a jury. I want to frame the legal issues with the key facts. What happened on the day of the explosion? The hydraulic power unit lost its hydraulic power because a coupling broke. This is critical. An explosion was inevitable if there was no safety backup, because with the loss of hydraulic power, the vapors would become trapped within this unit. They couldn't get out and more vapors were coming in. So again, the explosion was inevitable without a safety backup. The equipment came with a safety backup in the form of the accumulator. The accumulator is also run on hydraulic power, but it has a secondary power source, the bladder, which contains the nitrogen pre-charge. And it's that nitrogen pre-charge that would kick in to open and close the doors as necessary to prevent the explosion. The accumulator did not have the pre-charge on the day of the explosion, and so the inevitable happened. Within an hour after the coupling broke, there was the explosion. What did the appellee, the defendant, P.E.I., know about what I've just talked about before the event? P.E.I. understood that an explosion would occur if the HPU lost its hydraulic power. That's why it equipped the RTO with the accumulator. P.E.I. understood that the accumulator was susceptible to losing its nitrogen pre-charge, which is why it suggested to the user that the pre-charge be checked on a monthly basis. But P.E.I. also knew that the accumulator could lose its pre-charge at any time, even if it was checked on a monthly basis. Even if, though, doesn't apply in this case, right? Because it just was never checked. It was never checked by my client. There was a fact dispute about whether it was in there in the first place, but it was never checked by my client. Never checked, go ahead. Yes. All right, what did my client... I think the manufacturer has anticipated it will never be checked. In this case, I think that they could foresee that it would never be checked. Because, and it's important to understand this in the context of the RTO, the manual is pretty thick with all kinds of maintenance instructions over all kinds of things, including this. This accumulator, it's important to remember, is used on a daily basis. It is part of the normal cycling of the operation. It provides additional power to move the dampers during normal operations. It also has the secondary operation or function of being the safety backup. But that part was never explained to my client. That's not in the manuals. That's not in the instructions. My client understood that there was an accumulator. My client understood that the accumulator had a role to play in daily operations. My client did not know that the accumulator was the safety feature for this. And my client did not know that if it did not have the nitrogen pre-charge in it, that this kind of explosion could occur. That if the RT, if the HPU lost the hydraulic power, that without that nitrogen pre-charge in the accumulator, this explosion could happen. My client did not know that. How would you state the standard for determining whether a failure to follow instructions or failure to maintain, whether the foreseeability of that is a jury question versus a question of law? I think it's twofold. I think part of it goes to the nature of the warning. So in the Ehlers case, which I believe the other side cited frequently, that's a case where I think it was an actuary machine that the hospital didn't follow specific safety instructions in the court. And that case said that that would be a superseding act. But in that case, the instruction was specific. It was a safety instruction about how to use the x-ray to avoid the very harm that happened. They were trained on it and they didn't do it. This case is different. We don't have that kind of warning. This is a safety device without any warnings or even information about the fact that it is a safety device. Remember, it is used in daily operations. The safety function is secondary, unbeknownst to the user. So I think it's foreseeable that a user who doesn't understand or have any knowledge that it's a safety device might not perform regular maintenance, just like perhaps we don't all put oil in our car when we should. But the result of that is, well, maybe the car will stop running when I'm on the road, but not that it will explode. I get hit. Go ahead with Judge Collard's question. Yes, so I think that's part of it. But the other part of it is, so there's the warning aspect of it. There's also the issue of, and it's the restatement that we cited, Section 442B. The intervening act that's alleged here is the lack of maintenance. But the maintenance is required because of the defective design of the product. The product required user intervention in order for the safety feature to work. There were other options that would not require the user to have to do anything to make the safety feature work. But in this case, PEI designed a system with a safety feature that required active interaction by the user, by their standards, once a month. In that scenario, where the designer of the product comes up with a product that isn't safe on its own, that requires somebody else to do something in order to ultimately make it safe, the superseding doctrine does not come into place. A superseding cause completely negates the original liability. Now, we will concede, as we must, that there was no maintenance. We did not check the nitrogen pre-charge. And certainly the jury would be entitled to make whatever they want to make of that. That goes into the comparative fault analysis. What's your best case that lays that out, that says this sort of negligence by the user goes into a comparative fault analysis as opposed to a supervening cause analysis? Do you have a good case on that? Yeah, I think it's the Luta in our brief. It's Montemayor and Bursch go into that issue and talk about this section of the restatement. My question before was you answered it by arguing why you think the lack of maintenance was foreseeable, but I was really asking about a question at a higher level of generality about the law, which is, I gather under Minnesota law, foreseeability is sometimes a question of fact for a jury. I believe so. So the highest level on this is... And so what I'm trying to understand is how you would articulate the line between when it's a jury question and when it's a question of law for the court to decide. Is it just standard summary judgment? If any reasonable jury could say it's foreseeable, then... On the proximate cause issue or on the existence of the design defect? Well, where does foreseeability come in? Well, it has aspects in both. So, I mean, if the designer can foresee a danger with the product, they have a duty to design around it. So on that foreseeability issue, then, how do we decide whether it's a jury issue versus a question for the court to decide as a matter of law? Well, so in this case, I don't think there's any question that it was a dangerous product because they concede even in the warnings they have that it can explode. This was a safety feature they came up with to design against that explosion, and the specific issue here is whether or not that safety feature was adequately designed. Under Minnesota law, it's the reasonable care test. So I don't...the foreseeability, then, I think we're beyond foreseeability in this case because they did foresee the danger of an explosion, and they designed something that they thought would prevent the explosion. The issue here is the adequacy of the design of the safety feature. And we're saying it was a defective design because they could have done many other things. They could have...and we list a laundry list of them. So you're saying it's an application of the reasonable care test, and if a reasonable jury could say under the reasonable care test that they should have done it differently, then you're entitled to a trial? Yes. Yes. On that issue, the district court went through the reasonable care, the evidence that we proffered under the reasonable care test, and in essence acknowledged that that evidence was presented. The district court wrote, and I'm quoting, while it could...PEI could have used a second accumulator... What page are you at or paragraph or where are you? Can you give it any sort of reference? Is it in the discussion section? I have the fedsup third in front of me and the computer version. Just go ahead. If you can't find it, go ahead. Okay. The district court talking about PEI, while it could have used a second accumulator or compressed air or an alarm that sounded between 6 and 9 seconds instead of 15, it did not have to. PEI struck an acceptable balance among competing factors. That's what the jury does under the reasonable care test. What the judge has to do under Rule 56 is determine, is there evidence that Green Plains can take to a jury for the jury to do the balancing that the district court ended up doing? Clearly, the evidence was there. The judge discussed it, but then he went the next step and made the finding. He conducted the reasonable care balancing test and made a finding that it was not effectively designed and took that issue away from the jury. Under Minnesota law, failure to read warnings, doesn't that defeat any sort of plaintiff's claim? There's a limited rule on that. My research on it, we cited in the brief, is that if there's a warning on the product itself that nobody read, that can avoid the failure to warn claim. In this case, there was a warning label on the accumulator. There's no evidence that somebody didn't read it. There's evidence about this big manual, about whether or not people at Green Plains read the manual. There's no evidence about whether or not somebody read the warning on the accumulator itself, but that warning actually has nothing to do with the issue that brings us here. That warning is only about what to do when you're disassembling the accumulator. Your argument is that even if they had read the warning and complied with it, it would not have necessarily prevented this explosion? That's right. That warning has nothing to do with this case. Again, there's no evidence that… You mean just the one on the machine, not the manual? On the machine. Again, the case law, the law that says that a defendant can get out of a failure to warn claim if the plaintiff didn't read the warning, those cases, as far as I could see, are all talking about warnings on the product itself. When you're talking about warnings that are in an operation manual, there isn't case law that says that if somebody doesn't read… I mean, again, think of an auto manual that we get with our cars. They're very thick. This isn't an auto. I mean, why wouldn't the logical extension of the existing case law be that if you're running a major plant like this and you get a manual about an important piece of equipment and you don't read it, then you don't have a failure to warn claim? Well, it's analogous in the sense that the manual is not just a warning manual. It's an instruction guide. It does a whole lot of things. It provides a lot of information, the majority of which aren't really warnings. It's an instruction manual. And there's nothing in that manual that even comes close to informing this user that what the purpose of the pre-charge is in the accumulator, why it is that it's suggested that they change or check the nitrogen pre-charge every month. That's just not there. My client had no idea. But you seem to be saying even if the manual had a perfect warning, that would be insufficient. Because your guy doesn't have to read the manual. There's case law that says a user does not have to read a manual cover to cover because, again, it's not blatant that we're in a manual that what the warnings are. Now, when it's on the product itself, that's a different issue. When there's a clear warning on the product that somebody disregards. And in most cases where it has been held to obviate the failure to warn claim, it's a specific warning about doing the very activity that ended up injuring the plaintiff. And then the plaintiff said, well, the warning wasn't good enough. In that case, the court just said, well, you didn't read the first warning about the very thing you were doing. It's a very limited exception, and it's very specific to the conduct of the plaintiff, which is nowhere on this product or in the manual itself. Well, do you think these two claims rise and fall together? Or if the district court was right on the warning, could you still proceed on the other claim? I think we could still proceed on either claim. They're independent. But I will say that if the district court was correct on the first issue, the design defect, that only heightens the failure to warn claim because his ruling is the superseding cause was the lack of maintenance. Well, if that's the superseding cause that obviates their liability, then you really have a failure to warn claim because then you have to look at whether or not there was a sufficient warning. Again, my client had no understanding that this could happen from not checking the pre-charge. I see that I'm in my rebuttal time, so I will yield. You may. Thank you. Mr. Severson, we'll hear from you. Good morning. May it please the Court, my name is John Severson. I'm here on behalf of the Appellee Pro-Environmental, Inc. The 2014 fire and explosion at the Green Plains ethanol plant occurred solely as the result of the Green Plains failure to properly maintain a critical component in its ethanol production plant. And that component was an accumulator contained within the hydraulic power unit that powered the regenerative thermal oxidizer, the RTO. I think there's three critical points that I'm going to point out just to start with. The accumulator was charged upon commission. I think there was some question by Green Plains whether that had occurred. Green Plains' expert admits that occurred. There's evidence in the record from the person that did the commissioning. There's records that support it, and it's been admitted at argument below. The second is, had the accumulator been charged at the time of this incident, it had sufficient power to move the dampers to their fail-safe positions. Again, that's something that is admitted by the Green Plains expert, essentially that this component was properly sized and would do the job that it was designed to do. And the third one is that there is no evidence that anyone at Green Plains read the instruction to charge and fill the accumulator, and that's in spite of the fact that their plant manager, Mr. Sitzma, who is self-described as the most knowledgeable person about this component and this machinery, admitted that he knew this was a process that needed to be done. And I think these points are supported by a number of facts that appellant cannot dispute, and that's that Green Plains did not read or follow the instructions in the hydraulics manual that this accumulator was to be checked and charged every 30 days. It's our court's law, in interpreting Minnesota law, that matters whether it's maintained in a strict manner in the manual, not whether it's maintained like the manual says. Was this strict or not strict? This was... That's the Bursch case. I bet you know what I'm talking about. I do know what you're talking about. I think in this case there was no maintenance done at all. It wasn't maintained in any fashion, and I think the testimony was that... How many years did they have it? They had it for six years. And in that six years, the testimony is that there's no record that anyone ever checked this accumulator, checked for the charge, or did any maintenance on it whatsoever. And I think there was some question in the briefing about identifying... We'd identified Mr. Sitzma, the plant manager, in his testimony, and they said, well, you didn't identify other people. Mr. Sitzma is the person identified as the plant manager, the most knowledgeable person on it, and I think at this point there was nothing from the appellant to say, well, here's some other people that did the maintenance. What about the chief boiler engineer who said that he had read the manuals at a glance, but not cover to cover? Because I understand that's where he ended his testimony. Certainly. And that is the Mr. Sitzma that I'm talking about. Oh, okay, so we're talking about the same person. Well, he said he'd read the manuals. He said he knew the manuals were there, he'd paged through the manuals, but he specifically said he did not read that instruction as it relates to checking the accumulator. He was very solid in his testimony that he'd seen the manuals, he knew there was instructions in them, he'd never read that instruction. Why isn't it a jury question whether it was foreseeable that he wouldn't read the manual? And I think that goes to it not being foreseeable. I understand your argument that it wasn't foreseeable, but I also wonder if there's an argument that it was foreseeable and it becomes a jury issue. And there were several instructions and warnings throughout these manuals. We've used this car analogy a number of times and the court used it. This was not an unsophisticated user of this machinery. This was multi-million dollar machinery. This was a plant, Green Plains owns many of these across the country, and this was not their first time with this machinery. So it's not... What about the Bellotta case on page 630 that says plainly, this is a Minnesota law as I understand it, the Minnesota Supreme Court says it's foreseeable that the plaintiff will fail to heed warnings. What about that? I think, and it goes to, there were questions about the warnings that were provided, and I think as we read the initial brief from Appellant, it was that there was no warning on the machine. There was a warning on the machine, and we pointed that out. There's no dispute about that. I didn't warn about this problem as I understand it. It's not close to this problem, is it? It certainly, well, the warning itself says, and I'm going to paraphrase it just slightly because I'm not looking at it, it says failure to follow these instructions can result in property damage, personal injury, or death. It talks about discharging. It sounds like this is when you're disconnecting or disassembling it. It doesn't act like it's a maintenance point. It acts like it's a disconnecting or disassembling point. You know how it reads. I do know how it reads, and I think if you look below that warning, it directs you to a website, it directs Green Plains to a website of the Parker Hanifin Corp, and that website instructs users to check their accumulator once per month and provided the instructions to do so, and that's testimony from the Progressive Hydraulics. So that means you're saying the warning incorporates the website. The warning does incorporate the website. You don't have to put the warning on the product. You just have to put a website. Well, I guess I believe a warning is on there when it says it's warning about severe injury, death, explosion. You know, we're talking about, and it's clear that the instruction manuals here are lengthy, and I think the argument is that, well, some are buried within these instruction manuals. There isn't just instructions or suggestions. That's just not what these say. These are bold capital letter warnings that actually include a cartoon bomb icon next to them that says, warning, failure to follow these instructions may lead to death. And I think then when you couple that, when we're talking about a sophisticated user of RTO, of ethanol plants, it certainly clues in the user that there's a warning. And I guess the truth is, they admit that they knew about it. Mr. Sitzma admits that he knew that this was something that needed to be done. So, you know, I think the warnings are fully adequate. I still, and I guess this kind of is going back to my argument a little bit, there was no, we disagree that there was any duty to warn based upon the failure to maintain over the course of six years of use of this machinery. Every time I read Vallada, particularly, in this Minnesota test, my goodness gracious, they do give this reasonable care balancing to the jury in Minnesota, right? No, I don't believe that's the case. Well, that's what it says. Tell me if I'm wrong, because that's what I read the bare naked words to say. I think when it says, our cases say when, if we're looking for seeability, when foreseeability is clear, the courts, as a matter of law, should decide it. And as I read Vallada, and I'm skimming my notes here, you know, it says to determine whether there's enough evidence to submit the claim to a jury. Do you know what page you're on? I don't know what page I'm on. Okay, go ahead, proceed. And I'm actually using the Trost page, which cites Vallada, like most of the cases that we have in this area. It says the court must determine the likelihood of the harm, the gravity of the harm, if it happens, against the burden of precaution, which would be effective to avoid the harm. And then this is from the Trost case. It says that test is an objective standard, which focuses on the conduct of the manufacturer in evaluating whether the choice of design struck an acceptable balance among several competing factors. So I guess I disagree. And I think the fact that there are a number of summary judgment decisions out there, it's not a case that ultimately always goes to a jury. The fact that this possible explosion would be so catastrophic that there was a higher duty of care on your part? No. No, Your Honor, there wasn't a higher duty of care. You know, certainly there has to be warnings that are sufficient, and I think that's what they look to, or the duty, when, you know, it has to be in proportion to what our warnings are. And in this case, I think that we've given those warnings. It's, you know, I keep going back to it, but the explosion, death, personal injury, property damage. Counsel, again, what about our cases interpreting Minnesota law that say if the plaintiff identifies other feasible, I'm roughly quoting, other feasible safety devices that should have been incorporated in the original design and the expert witness says that, they get to the jury? Absolutely. And I think that's where we fail is that those alternative designs, and that's really what Green Plains is saying, that in order to show that there's a defect, they use alternative design theories. The alternative designs that they have identified do not render this product defective. And I guess the case is, and this is the Larson case, the mere fact of an alternative design does not prove that the design used was effective. Here we have a number of alternative designs that were presented, and I'll use the compressed air, the weighted damper, the redundant accumulator. None of these were tested by their expert. I thought one of them was compressed air was on a competing product. I believe compressed air may be on some competing, that actually was not clear. It's certainly not in any of the Green Plains facilities. This is a product that, it's the industry standard, and I think that's what Ed Bauer, the progressive hydraulics expert, or not expert, the witness said, this is a product that's used in 75 plants throughout the country. And he said it's the standard, and has been the standard for 40 years, to do this hydraulic power unit along with the bladder accumulator.  The record has no other explosions. Well, but does it say there are none, or is it silent? It's not silent. I can tell you for the P.E.I., P.E.I. has never had another explosion. No, but this is in the record, counsel. This isn't the record. Okay, it's in the record. Yep. We'll find that, that there never was another explosion. Yes. Okay. If you look at the actual alternatives that their expert gave that were expert supported, it's the alternative setting between the 6 and 9 seconds as compared to the 15 seconds. And at its core, this is another warnings claim. Mr. Minden, who is their expert, does not argue that the design, this design changes the functionality of the RTO. Instead, he is hypothesizing that a signal would have served as an additional warning. Do you think that the failure to warn and the defective design rise and fall together, or can they be split? Well, I believe they fall together in this case. I don't think that they would be. I think they could be exclusive in a case, theoretical, if we were looking at it. But in this case, you think they go together. Correct. But that's because you think the evidence is insufficient on both. There's nothing logical that dictates. Exactly. In this case, I think the evidence shows that both of them fall. Do you know this case Johnson against Sarah from the Eighth Circuit? Yes. The plaintiffs rely on that for the idea that the court says when there was a negligent design, the negligence was continuous and ongoing, so that when the user failed to follow the instructions, that was not a superseding cause. It was concurrent negligence, and it was proper then to apportion the fault. You don't even cite this case in your brief, so I wanted to ask you whether you think that that – well, do you have anything to say about it? Yes. My thoughts are there's nothing to indicate that this failure or this event occurred except for the lack of maintenance. So I guess that might go to an initial design defect, but I don't think that case applies at all when we're just looking solely at maintenance. Maintenance is the reason that this failed, and there's really no dispute about that when you look at what the experts have said. Certainly our experts, and this is Mr. Pennington, Mr. Barbera, indicate that maintenance was the reason that this occurred. The only other expert is plaintiff's expert, Mr. Minden, and he doesn't speak to maintenance, and whether that's because it's bad for him or otherwise, there is just no record that he's saying, no, maintenance was appropriate in this, or maintenance wasn't the reason. He just doesn't even speak to maintenance, and so I think there is no competing argument against the maintenance not being sufficient in this case. Well, the argument is that there was a design defect, and if it had been designed differently, then the failure of maintenance wouldn't have caused the explosion. And the two design defects that they identified, or at least I would say expounded on. I want to talk about the weights in the springs and the alarm, or at least two of them. There might be others. Sure. So the weights in the springs weren't something that were tested by any of the experts. These were hypotheses or theories that Mr. Minden had provided, and so I think expert testimony can be properly excluded when an expert is proposing safety modifications. If he's not demonstrating by some means that they would work to protect the machine operators or would not interfere with the machine's utility, and that's from the McCormick and the Finke cases that we've cited. As far as the alarm, I think that claim fails for two reasons. One is that Green Plains was already experiencing these alarms, and these were alarms, these were damper fail alarms related to the dampers not making their transitions. Now they did nothing to investigate what these alarms were, and their testimony from their expert is that many things could affect the timing of these damper transitions and ultimately make these alarms occur, and that's worn seals, hose leakage, leakage in the cylinders, issues with the proximity switches being out of alignment. So I think their argument is flawed because the damper alarms were occurring commonly, both day of the event and before the event, but they were ignored. There's no indication that any Green Plains employee ever checked the accumulator's bladder or reviewed manuals when these alarms were going off or did anything to follow up on these alarms. Well, you keep emphasizing facts like they happened, and the test in Minnesota, as I understand it, is foreseeability, pure foreseeability written a hundred times, or I'm exaggerating, written many, many times in an opinion, many, many times in an opinion. And to focus you on Montemayor, page 630, it says it's well-established. Manufacturers can be held liable despite employer's comparative negligence. A plaintiff's failure to heed warnings, and they do where they removed a safety device, and they do where it says on the machine, don't put your hands in here, who have the power connected, and they put their hands in there, and they still let that go in Minnesota. Now, that looks very bad for you. Can you help me on foreseeability, just being boundless here? Certainly, and I go back to the initial person that Green Plains had inspect this plant after it happened. This was Dave Vandergrind, and he was brought in to advise on the rebuild of the plant, and he looked at the chain of events leading to the fire and explosion, and this was his quote in his report. He says, this is not an event I would have even considered could have happened prior to seeing the evidence at the plant. This is plaintiff's witness. This is their expert. And so I understand the foreseeability. We have experts saying it just isn't a foreseeable thing, even to an expert, that this is something that could have occurred. It's certainly not foreseeable that a sophisticated user of many ethanol plants would fail to do any maintenance at all on a bladder accumulator over the six years that the plant was in commission. What was the evidence on designing this machine with compressed air rather than nitrogen, and whether that would have certainly an alternative design that would have allowed the same functionality without the risk? There really is no evidence of any other design that has been studied. I'll go back to Progressive Hydraulics, the designer of this, or the manufacturer of this equipment. They stated, they testified, that this is the industry standard. It has been for 40 years. Well, what about compressed air? There's a competitor product with compressed air. Certainly, and I think that there's not, as I look at the expert reports, that's really not where they're going. I read it as more they're complaining about the timing of the alarm system. But in any event, I think the mere fact that an alternative design doesn't mean necessarily the PEI's design was effective. And this is one thing I wanted to get to before I had to be done. I wanted to make sure I was clear. There is no one fail-safe position to be used in these. There are a number of events that could occur in different parts of this facility that would require dampers to be moved in order to segregate areas of the plant where there might be an emergency happening. And I bring that up slowly as you're looking through the different theories that are proposed. None of them deal with that. None of them address that, wait a second, there is more than one fail-safe position. So, for example, if you're used to a large weight or a spring that, on a failure, closes something in one position, that's not a feasible thing, and the experts don't actually address that. And that's a failure of these alternative designs. No experts were, I'm sorry to say, thrown out. All the experts were considered to be experts here. The district judge does not say anywhere, right, that some of the experts are just beyond the pale and not really experts. No. Kind of a Dawbert approach. No. No, none of that. Go ahead. Okay. As we close, all available evidence in this case was that no Green Plains employee read or relied upon the warnings. The plant produced no evidence to contradict the testimony of its employees that it had not read or followed the manual instructions. Further, while there is no requirement that the warning must be directly affixed to a product, the HPU in this case did, in fact, have an attached warning. Without having relied on the warnings, Green Plains cannot maintain an action complaining about their sufficiency. There's no causal link between the warnings and any of the appellant's injuries and the district court properly granted summary judgment. Thank you for your argument. Thank you. Thank you. Mr. Orlando, we'll hear from you in rebuttal. Thank you, Your Honors. Judge Benton, I read from page 10 of the district court's opinion. The counsel mentioned the witness, I forgot his name already, on the foreseeability issue who testified that this is not something that he could have imagined would have happened. Well, that witness is the owner of the competitor who has the air compressor in their system. And that's why he couldn't foresee this, because his systems don't rely on an accumulator that needs the nitrogen pre-charge to work. He's got an air compressor in his system. And that was the context of his statement. And so there is actual evidence in the record of a competing product that doesn't use the nitrogen pre-charge but uses an air compressor as the safety backup. Judge Benton, you're absolutely right. In Minnesota, it goes to the jury. And that's on page 12. Well, this is really clear. Well, I think where the confusion came in, and we cite the cases on page 12 of our brief, it actually goes back to Lee v. Crookston, Minnesota Supreme Court in 1971. To recover under the rule, the injured party must present evidence direct or circumstantial from which the jury can justifiably find. And then it goes into these factors. What's happened over time is that some of the federal courts have used the words, the court determines the reasonable care. And I think that's sort of worked its way into the federal case law in this. But I think you're right. If you go and look at the state law decisions on this for Minnesota, it's a jury test. The issue of, again, the superseding clause, there is no dispute that my client did not do the maintenance. We understand that. The issue is whether that lack of maintenance completely negates the liability for the design defect. And in a situation where the designer creates a system that shifts that burden to somebody else to maintain. Again, what shifts the burden? Well, their design shifted the burden. They understood that this accumulator is likely to use the nitrogen pre-charge. So they didn't come up with a system where the pre-charge would stay in place. So they said to the user, we suggest you look at it once a month. We're not going to tell you why you need to look. Monthly. Monthly. Yeah, go ahead. We're not going to tell you why you need to look at it because, again, the accumulator is used in the normal operations. The user has no idea that this is a safety device. And it could lose its pre-charge even if once a month, monthly, the user is checking the pre-charge. It could lose it at any time. We agree. We're not saying that this gets us off the hook. What we're saying is this is a classic jury question. It's comparative fault. Their design defect. You don't use that term in Minnesota, comparative fault, do you? Other states do. Do you use the term comparative fault in these cases? Correct me if I'm wrong. I'm not from Minnesota either. But I saw it in the balada, in the decisions we cited. Sorry. I think it's the Johnson case that Judge Collington mentioned and talked about that goes to the jury as comparative fault. Could the argument be, without saying so, that they should have designed a foolproof system? Not a foolproof system. But they had alternatives that weren't any more burdensome than the accumulator that they put on it. We went through all of those alternatives, which the district court weighed. And, again, he put himself in the role of the jury in weighing those things. But there are alternatives that would have avoided this issue. It doesn't have to be foolproof, but there were alternatives. What about the argument that none of them was tested? Experts' hypotheses. Well, that's the argument, but it's not true. Because, again, the air compressor, it's in the marketplace. It's the competitor who uses it. What about the weights and springs and the alarms? Have those ever been tested on a system that uses the nitrogen? Well, the weights were added to this one after the fact. I don't know if weights had been tried anywhere else before, but they are in place now. They were added after this incident. The accumulator comes with the alarm, and it just happens to be set at 15 seconds instead of 8 seconds. But it comes with the alarm. What about the fact that your guys weren't responding to the alarms anyway? Well, that's the argument. I didn't really understand it, and I didn't get the record sites for it. Those alarms have nothing to do with this accumulator and the 15 seconds. That never went off. I think the alarms they're talking about has to do with the 3-minute cycling of the system, which is a different issue. And there's some testimony that those alarms weren't checked. But that has nothing to do with this accumulator and this issue. So the 15-second alarm never sounded? It never sounded because the system was designed to work. It would do its job daily in 9 seconds. The accumulator was trying to get that down to 6 seconds. If the accumulator didn't work, it would take 9 seconds. Had the alarm been set for 7 or 8 seconds, then the user would have known, oh, this accumulator isn't working because we're not getting it done in 6 seconds. Because it was set for 15 seconds, it never sounded because it always got it done in 9 seconds. All right. Thank you for your argument. Thank you, Your Honors.